NOTICE

Decision filed 08/12/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230137-U

NO. 5-23-0137

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 04-CF-186 |
| | ) | |
| JOSEPH T. HORTON, | ) | Honorable |
| | ) | Jason M. Bohm, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices Boie and McHaney concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court's denial of defendant's motion for postconviction forensic testing is affirmed where the testing would not substantially advance defendant's claim of innocence.

¶ 2     Following a jury trial, defendant, Joseph Horton, was convicted of first degree murder, in violation of section 9-1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(1) (West 2002)), with the jury also finding that the murder was accompanied by exceptionally brutal or heinous conduct indicative of wanton cruelty. Defendant was sentenced to natural life imprisonment. Defendant appeals the trial court's denial of his second motion for forensic testing filed pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2022)). For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4       On January 30, 2004, defendant was charged, by information, with five counts of first

degree murder in violation of section 9-1(a)(1) and (a)(2) of the Criminal Code of 1961 (720 ILCS

5/9-1(a)(1), (a)(2) (West 2002)) related to the stabbing death of Amy Smith on Thursday, January

29, 2004. The following evidence was presented at the trial.

¶ 5       Officer Stephen Reynolds, a Champaign police officer, was the first officer on the scene of

the homicide. He was met by Officer Jolley who was with Michael Brown. Michael had returned

to Amy's apartment after advising the police of his concerns about Amy's welfare. Officer

Reynolds noted blood in the snow on the ground and blood on the door handle to Amy's apartment.

When Officer Reynolds peeked around the corner of the stairwell leading to Army's apartment, he

saw a body lying face down on the floor in the living room. He called for an ambulance and notified

the coroner. He told Officer Jolley to inform Officer Biers to isolate Michael. Officer Reynolds

stated there was "a lot of blood all over the living room" so they walked north of the body to search

the other rooms in the apartment. They were unable to get into the kitchen, but checked the

bathroom, hallway, and bedroom. Nothing out of the ordinary was seen in those areas. Officer

Reynolds was at the scene when medical personnel arrived, and he informed the personnel that

they wanted to protect the scene as much as possible. They laid a red bag next to the victim and

medical personnel stepped only on the bag to attach a cardiac monitor on the back of the victim's

body. No signs of life were found. On cross-examination Officer Reynolds confirmed that it was

impossible to walk in the apartment without getting blood on the soles of his shoes.

¶ 6       Michael Brown testified that Amy used to date his older brother. He was friends with Amy

and saw her almost every day. He would occasionally visit her job and home. He knew the other

people who lived in Amy's building. He stated that Amy knew someone named Joe and that he

saw Joe about three times when Amy was still alive. He never saw Joe at Amy's apartment. He identified Joe as defendant. Michael last saw Amy on January 28, 2004, around 11:15 p.m. They were standing outside her door, and she was smoking a cigarette. Prior to that, they rented two movies and went to the store. They were together for about four hours. He stated that Amy received a phone call right before 10 and a second one about seven seconds later. After the two calls, Amy spoke to the two girls that lived upstairs. When he left Amy's house, they made a plan that he would see Amy the following day at the market. Amy's apartment was neat when he left. Amy was laughing and told him that she would see him the next day.

¶ 7    After Michael left Amy's apartment, he went home, where he lived with his mother and son. His mother was up when he got home, and they talked for a while. He did not go out the rest of the night. He identified the photo of Amy and confirmed that she had all her teeth when he left her house. The next day, he went to the market and Amy was not there. After talking with Amy's coworker, Michael left and went to Amy's apartment. He parked in the alley right in front of her door because he saw Amy's car. He went to Amy's apartment door and knocked. He did not get a response. He knocked again and got no response. He pushed open the door and saw blood on the wall and the floor. He called out to Amy but got no response. He did not go into Amy's apartment. When he came back out, he also saw blood in the snow. He went to the Champaign Police Department and told a woman about his concerns for Amy. He then returned to Amy's house and waited for the police to arrive. When they showed up, he explained that he was supposed to meet Amy, saw blood in the apartment and said, "something's not right."

¶ 8    On cross-examination, Michael confirmed that he and Amy were just friends. He stated that Amy told him about Joe but did not tell him anything about their relationship. As far as he knew, Amy, who told him everything, was not seeing anyone and did not have a boyfriend in

3

January 2004. Michael confirmed that he was African American and bald. He stated he was five feet nine inches tall. On redirect he stated that he weighed about 225 pounds in January 2004 and described his build as short, stocky, and a little overweight.

¶ 9    Leigh Ann Borkowski testified that she was dating defendant at the time of Amy's death. She and defendant met in May 2003 and the relationship continued through January 2004. Leigh Ann did not know Amy. Leigh Ann stated that she spoke with defendant on Wednesday, January 28, 2004, by telephone and they made arrangements to go out that evening. She picked him up in her car around 8 or 8:30 that evening. After going to two bars, defendant drove them back to Leigh Ann's condo between 11 and 11:30 p.m. On the drive back, defendant was angry, and they argued. They went into her condo, and she eventually terminated her relationship with defendant that night. Joe had previously given her an amethyst ring and she gave defendant the ring back that evening. He left at some point after midnight on foot. She said it was snowy and very cold that evening. Defendant called her around 7:15 p.m. on January 29, 2004. During the phone call, defendant told her that the police had found a body and thought he had something to do with it. Shortly after, the phone conversation ended.

¶ 10    Leigh Ann described what defendant was wearing that evening, stating he wore a black jacket, a gray hooded sweatshirt, black nylon running pants, and tan work boots. Defendant also wore a solid black knit hat. She confirmed that the black jacket was a winter coat. She purchased the pants for defendant and stated they were thin running pants. She identified the jacket, boots, and the gray sweatshirt classified as the State's exhibits. Leigh Ann confirmed they were clean and not in the current condition when she saw the items on defendant.

¶ 11    On cross-examination, Leigh Ann agreed that the work boots were fairly common in society. She stated she knew the boots shown to her were defendant's boots because she moved

4

them from place to place around her condo and was familiar with them. She agreed that the sweatshirt defendant wore that evening did not have a hood and was incorrect in stating it was a hoodie. Leigh Ann further testified that she told police about defendant stating that the police were looking for him regarding a body that was found in Champaign.

¶ 12    Edward Chin testified that he was the owner of the building where Amy lived. Edward lived on the second floor of that building. He stated that Danielle and Maggie lived in the apartment on the first floor and Amy began living in the furnished basement apartment around November 2003. On January 29, 2004, Edward was in his apartment and was awakened around 3 a.m. when he heard pounding on a door. He saw a shadow by Amy's upstairs door and heard Amy's voice from inside. After Amy said something, the person moved back, and Edward saw the person's forehead. The person then moved toward the alley and passed a motion detector. The person turned around by the garage and turned back towards the building. At that time, Edward determined the person was a male. Thereafter, Edward went back to bed. Around 4 a.m., Edward heard something like a thumping noise. He heard two thumps. After a period of silence, Edward heard what sounded like a person gasping for air. He went into the hallway to determine if the sound was from a stereo but did not hear the noise again and went back to his apartment. He left the apartment around 5:30 a.m. to go to work. The last day that he saw Amy alive was on Monday, the same week she died.

¶ 13    On redirect, Edward explained that he would go to the basement to have Amy dry his clothes because his dryer was not hooked up and needed a 240-volt outlet. He believed that occurred on the Friday before but was unsure of the time. Edward agreed that he spoke with police on January 29, 2004, around 12:30 p.m., while he was at work. He disputed telling the officer that Amy was folding his laundry at 8:30 p.m. on January 28, 2004. He stated that Amy had already folded the laundry and he entered her apartment to retrieve the clothes. He stated that he previously

5

saw a black male on her bed around 5 or 5:30 p.m. He could not describe the man and stated he had no idea who that person was. Edward testified that he heard someone knocking on Amy's door between 7 p.m. and 9 p.m. on Tuesday night. When he looked out the window, he saw two black males and a black car in front of the house. He clarified that he took his clothes to Amy on Friday before the weekend because Amy's birthday was that weekend and accused defense counsel of combining different days. He saw Amy on Monday as she was passing through and on Tuesday, he saw the two black males at Amy's door. He did not recall telling a police officer that he saw a black male that was 6 foot tall and 260 pounds in Amy's apartment. As to the person he saw the morning that Amy died, he said it was a black male taller than five feet. He agreed that he could have been as tall as six feet. He could not give a weight or description because the person had on winter clothes.

¶ 14    Edward clarified the timeline as seeing Amy on Friday for the laundry and seeing her in passing the following Monday. When he was in Amy's apartment that Friday, he saw the black man lying on her bed. He never saw the man get up. After Amy told him who it was, he knew who the man was. He did not speak to the man because the man was sleeping. He did not see that man in the courtroom. He saw the two black men pound on Amy's door between 7 p.m. and 9 p.m. on Tuesday and he heard Amy open the door and saw the men go inside. He then heard the pounding on Amy's door at 3 a.m. on Thursday morning. An hour later he heard thumping sounds and human gasping. On redirect, he was unsure of the hair style of the man that was in Amy's bed but said it was short.

¶ 15    Danielle Miller is a hair designer who lived in the same apartment building as Amy. Danielle lived with Maggie in the middle apartment that used to be the main level of the 100-year-old house. Ed Chin, the landlord, lived above them, and Amy lived in the basement apartment

below them. Amy had lived there about two months. Danielle stated there was an alley that ran along the north side of the house. They parked their cars in the alley and behind the house. Danielle explained that her living room was above Amy's living room. There was a main vent in the house which ran from her living room down into Amy's kitchen and living room, so it was very easy for her to hear things that were going on in Amy's apartment. She said some things were muffled but if someone yelled into the vent or was playing a stereo downstairs, she would hear it. She could hear things best in the living room vent which was a 5-inch by 12-inch hole.

¶ 16    On January 28, 2004, Danielle was having margaritas with her friend Rebecca who came over between 7 and 7:15 p.m. Maggie was also there but she did not drink. Danielle had half a margarita because she was on medication for bronchitis. She knew Amy was home that night because Amy and Mike yelled through the vent and asked them what they were doing. Danielle shouted back that they could call them and did not have to use the vent. She knew it was Mike Brown because she knew his voice which was a little high-pitched with a slight lisp and his giggle. That conversation occurred around 11 p.m. Danielle explained that she initially met Mike Brown three days after she met Amy. Amy referred to Mike as her brother. Danielle stated that Mike was like a guardian angel and looked after all of them. Mike and Amy came up around 11:30 p.m. so Rebecca could meet Mike. Around 11:35 p.m., everybody left. After they left, Danielle went to bed and Maggie stayed up on the computer. Danielle slept from about midnight to 1:30 when she woke up from her own coughing. She then went to the computer room and played solitaire. She explained that the computer room was the old front porch of the house. Around 2:30 a.m. she heard three large poundings on Amy's door. Danielle walked into the kitchen, which was more toward the back of the apartment. There, Danielle had a cigarette and looked out the kitchen window to see who was knocking on Amy's door. She stated that the door was about five feet away from her

window. It was dark outside, but the alley was lit by a streetlight. There was also a motion sensor light on Amy's door. When she looked out the window, she saw a man in dark pants and a jacket. She did not hear anyone answer the door. She said the dark jacket was like a Carhartt jacket with a hood. She saw the man's hands because they were exposed, and they were very large and muscular. The man had black skin.

¶ 17    When Danielle returned to the computer room, she heard Amy's voice. She dozed off for about 30 minutes to an hour while she was in the computer room and was awoken by banging on the door again. By then, it was about 3 a.m. Danielle went into the living room so she could hear what was going on. She stated that Amy repeatedly stated, "go the F away." Her voice was shrill, and she did not want that person in her house. She kept saying, "get out" over and over. She could also hear a second voice, but it was muffled. She did not hear a third voice. The second voice had a very low rumbling tone. She stated the voice did not belong to Mike. She believed Amy and her guest were having a heated discussion that was none of her business, so she went back to the computer room and dozed off again. Maggie came in later and woke her up. Danielle heard a crash like a vase falling. It was very loud and startled her. The crash sound came from downstairs. She and Maggie went into the living room to try to figure out what was going on. She heard the lower voice repeatedly going "unnh, unnh" over and over. She lost count after hearing it 12 times. She thought it was an unusual sound and believed it could have been a sexual sound. She also heard roughhousing—things just back and forth being smashed or moved. She did not hear two voices, only the low muffled sound. She heard crunching like under someone's feet.

¶ 18    She and Maggie discussed the noises they were hearing and decided they did not want to call the police because they did not want to embarrass Amy if she was having sex, so they decided to try to call Amy. Maggie tried to call Amy. The first time, Maggie dialed the wrong number. The

second time, she could hear Amy's phone ringing downstairs. No one answered Amy's phone. She did not hear any sounds when the phone was ringing. Maggie tried to call again. Danielle again heard Amy's phone ringing. She then heard Amy's door open, someone moving swiftly up the stairs, and out the door.

¶ 19    Danielle ran to the kitchen, climbed up to the countertop so she could see clearly out the window, and she saw a person leave Amy's apartment. She saw the person take the jacket they were wearing and shake it against his neck. His hands were on the front of the jacket. There was a hood on the jacket that she believed was either dark navy or black. She believed it was the same jacket she had seen on the man earlier in the evening. The man looked side to side and then pulled the hood up slightly on his head. She said the man was bald but there was a slight peach fuzz dimming the reflection of the light. She stated that typically a man could go two days before having to shave his head if he was picky, but it could be four days if he was not picky. She said the man was black and his pants were either navy or black. She could not see his face and could only see his profile. She recognized the guy she saw walking out of Amy's apartment. She had seen him a couple of weeks earlier when Amy was in Danielle's apartment and the man was knocking on Amy's door. The man was wearing the same jacket. At that time, it was daylight, and she was able to get a clear look at the man. Danielle identified the man she saw as defendant.

¶ 20    She stated that defendant left Amy's apartment and headed west toward State Street. She confirmed four times that the person she saw weeks before was the same person she saw leaving Amy's apartment that morning. She stated that she then went into the laundry room to watch the person leave. He was yelling at the house and gesturing. She could not hear him, but he extended his right arm and pointed while yelling. Eventually she went to bed. When she got up, Maggie was wondering if they should go down to Amy's apartment because she did not come up for coffee

9

like usual. Danielle eventually left for work around 10:45 a.m. and noticed a red spot in the snow in front of Amy's door. Danielle knocked on Amy's door but received no response. She then called Maggie and told her to call Amy's phone to see if she was down there. Maggie called and Danielle heard the phone ring. She told Maggie that something was not right, but Maggie thought the spot might just have been antifreeze or transmission fluid. As she was leaving, she saw Mike coming towards Amy's apartment. She waved at him and went on to work. She explained that Mike came to see Amy every morning to check on her. Danielle stated that she later found out, while at work, that Amy died. Danielle collapsed on the ground when she found out. Later that day, she spoke with detectives from the Champaign Police Department. She described to the detectives what she observed that night.

¶ 21    On cross-examination, Danielle confirmed that Amy was one of her close friends although she did not know Amy's last name. She agreed that she discussed the person she saw outside the window with Amy but disagreed that his name was Mike. She told police that she assumed his name was Mike, because Amy knew three men named Mike. She agreed that her description was of a black male five feet five inches and between 20 or 30 years old. She stated that the person had short hair that lined out. She agreed that she did not state the man was bald. She also agreed that she did not tell the detective that she dozed off between the two periods when she was sitting at the computer. She clarified that her clock was set 20 minutes fast because she was always late. She agreed that she was shown a photo lineup. She further agreed that she did not pick any of those individuals in the lineup and told officers that she "knew" it was not any of the people in the lineup. At the hearing, she stated that she was flustered at the time. She did not look at any other photos and was never shown any other lineup. She explained that she was able to identify defendant based on his stance and his hands. She agreed that she believed in justice, wanted to make sure the person

10

was punished, and was still angry about Amy's death. She confirmed that she and Maggie made three calls to Amy's phone. She stated that she saw the person in profile and agreed that she believed his name was Mike. She was not informed of defendant's name until February 2004, when the police came to her work and told her they had found him. She put it all together when she saw defendant's picture in the newspaper and remembered him being with Amy earlier. She agreed the picture in the newspaper was the same one from the lineup.

¶ 22    On redirect, Danielle confirmed that defendant was the same person she saw leaving Amy's apartment that morning. She stated that she had no doubt it was him. She stated that she told the police that the man's name was Mike because Amy had three Mikes in her life. It was not Mike Brown or "White Mike." She confirmed that she was not able to pick defendant out of the lineup that she reviewed two hours after finding out that Amy died. She stated the pictures were close-ups of faces and defendant's face was not that close in real life. She was looking at his stance and profile. She said that before the person put the hood up, she saw his head. His occipital bone was just slightly protruding, and she could see peach fuzz around that. Based on her experience as a hair designer, it was the hair of someone who usually shaved their head but had not shaved it in a couple of days. The normal haircut would have been bald. She stated that lined hair is what it is called when it is growing out on their hairline. She did not mean that there were lines in the hair. She agreed that she was looking down at the person who left Amy's apartment and it was difficult to judge height or weight due to his wearing winter clothing.

¶ 23    Margaret "Maggie" Ruch testified that she was Danielle's roommate. Her testimony regarding the layout of the apartment, the residents, the vent, Rebecca's visit on the evening of January 28, 2004, the conversation with Amy and Mike Brown through the vent, and Rebecca leaving around 11:30, was consistent with that provided by Danielle. She testified that she woke

11

up because she thought she heard noises coming from downstairs and she had to use the bathroom. It was around 4 a.m. and she said the sounds were moaning noises. When she initially heard it, the hairs on the back of her neck went up because she thought she heard something break as well. But then she assumed it was just noise from a sexual encounter. After she left the bathroom, she went to the porch, spoke to Danielle, and laid down on the futon. She then heard a noise like somebody hitting a wall with their fist. The noise woke her up again. She thought it was around 5 a.m. She and Danielle then attempted to contact Amy by telephone and Maggie's testimony was consistent with Danielle's testimony on this issue. She further testified, consistent with Danielle, regarding the reasons why they did not call the police.

¶ 24    Maggie could not recall when she woke up the next day but thought she was at the lab by 11 a.m. She stated that before she left, Danielle called and asked her to knock on Amy's door because Amy's car was still there. She did not knock on the door. She rang the doorbell, but she did not know the doorbell did not work. No one answered. She stated that right outside Amy's door, she noticed something red in the snow, but since that was where the landlord usually parked, she thought it was transmission fluid. She was at the lab approximately 10 minutes when Danielle called her and told her Amy was dead.

¶ 25    Pearlie Mae Williams testified that she lived at 606 South State Street in January 2004. Pearlie lived with defendant's brother and stated defendant was a friend. She testified that defendant came to her house early in the morning on January 29, 2004. She believed it was before 6 a.m. and could have been as early as 5 or 5:30 a.m. Defendant came in and sat in the kitchen and they talked. She stated that they talked for a few hours, and he left around noon that day. She stated that defendant got ill a couple different times that morning and used her bathroom. After defendant left, Pearlie went into the kitchen to put something in her trash can and there was a new bag. She

12

stated it was not unusual for defendant to take out her garbage. Pearlie identified a picture of her house and the dumpster next door to her house. She confirmed the trash bag in the dumpster was the bag from her house by the hand-written items found in the bag. She also identified some of the items found in the trash bag. She was shown a picture of a pair of shoes that were dark color with colored highlighting on the side and identified them as her daughter's boyfriend's shoes that were eventually given to defendant's brother. She never saw defendant's brother wear the shoes and stated they were kept in the closet at her home. She agreed that she looked for the shoes, with the police officers, and they were no longer in the closet at her home.

¶ 26    James Powell, a friend of defendant, testified that defendant showed up at his house around 3 p.m. on January 29, 2004. James had to work that night. Defendant asked if he could come in, sit down, and warm up. At that time, defendant was wearing a dark jacket and dark-colored pants. After defendant attempted but failed to catch the bus twice, James allowed defendant back into his house. Around 5:40 p.m., defendant again left to try to catch the bus but missed that bus as well and returned to James's house. James told defendant he was not letting him back in because he had to work that evening and needed to get some rest. James stated that defendant asked if he could borrow a coat because it was cold, but James told defendant that he did not have any coat other than the one he wore himself. He let defendant borrow a baseball cap. On cross-examination, James stated that defendant was wearing a thin black jacket. He confirmed that the jacket was not warm enough for the cold weather outside.

¶ 27    Larry McGowan testified that he was a friend of the defendant. Larry stated that he was at home on January 29, 2004. Around 5:45 p.m. defendant came to his house asking for a ride to his sister's house. Larry agreed to give him a ride and was also taking his wife somewhere. While Larry was in the garage, defendant asked him for a coat. He did not have a coat to give defendant

13

who was wearing a thin coat at that time. They all got in Larry's vehicle and Larry's wife was dropped off first. Larry needed to borrow a friend's car because one of his headlights was out, so he and defendant went to Countrybrook Apartments. When Larry got out of his vehicle to get the other vehicle, defendant was wearing his thin coat while sitting in Larry's vehicle. When Larry came back, defendant no longer had his coat on. He asked defendant what he did with his coat, and defendant told him that it smelled bad, so he got rid of it. They then got into the other car and Larry dropped defendant off at his sister's house. Larry stated that he was later contacted by the Champaign police and provided a tape-recorded statement for the officers.

¶ 28　Detective Mike Huckstep of the Champaign Police Department was also involved with Amy's homicide case. He interviewed Larry McGowan and drove with Mr. McGowan to Countrybrook Apartments. Mr. McGowan directed him to the trash dumpster at that location. Detective Huckstep stated the garbage in the dumpster was covered with snow and also contained a black jacket that was not covered with snow. The jacket was photographed and taken into evidence. He identified the jacket. He could not recall if the jacket was hooded when he obtained the jacket.

¶ 29　William Fabian testified that he was the Champaign County Deputy Coroner. William examined the victim for signs of life and found none. He confirmed that he donned shoe covers and latex gloves when he entered the victim's home to avoid contaminating the crime scene. His recollection of the scene was that it looked like there was a struggle. The victim was covered in blood and, from his vantage point, "it was very obvious that she had died a traumatic death."

¶ 30　On cross-examination, he again confirmed that the body had no sign of life. He further confirmed that he never stepped in any blood. He stated that some of the thicker areas of blood were congealed which indicated that it had been there for some time. He further indicated that

when the victim's body was rolled over to remove it from the scene that he saw tufts of hair on the front of the victim and pointed them out to the investigators. The evidence was taken prior to the body being further moved.

¶ 31   Dr. Brian Mitchell testified that he was a forensic pathologist who performed Amy's autopsy, in Bloomington, Illinois. Much of the victim's hair was covered in blood. They pulled any trace evidence off the body and began looking for evidence of injury. Upon examination, there were a number of blunt lacerations located on the face and neck area. There were also some stab wounds on the side of the neck, head, and left lateral chest. Both eyes were swollen shut and blackened and there was a V-shaped laceration in the center of the forehead along with some circular-shaped and linear lacerations on the face. Her right ear was torn and there was a pattern abrasion adjacent to that area. There were a number of abrasions in that area and under her chin. There were lacerations on the inside of the lips and one of the teeth was fractured. There were also a number of abrasions and bruises present on the left forearm, left upper arm, and hands. He explained that defensive wounds were abrasions, bruises, or cuts that were present on the outside surfaces of the appendages, particularly the forearms and the backs of the hands. Those wounds were called defensive wounds because they were consistent with someone trying to ward off an attack from either a blunt object, or to protect themselves from a sharp object. Dr. Mitchell opined that Amy's wounds, on the backs of her hand and on the left forearm, were consistent with defensive injuries.

¶ 32   Dr. Mitchell described the V-shaped laceration on the forehead as measuring three inches by two inches. The laceration caused a flap of skin to rise up and away from the skull. He stated that area would have bled profusely from the injury. He stated there were also lacerations on the eyelids. He explained that a laceration was a cut and was different from a stab wound. A laceration

15

was usually inflicted with a blunt object and the elastic tissue fibers below the skin would be seen. A stab wound would penetrate the skin and the elastic tissue fibers would not be seen because they would have been cut by the object that penetrated the body. He further explained that an abrasion was a scrape and a couple abrasions were found on the victim's nose. The white portion of the victim's eyeballs was completely red from the blood that tracked into that area following the blunt force trauma. The victim's cheeks had both lacerations and abrasions. The lips were lacerated or split from blunt force. The inside of the right cheek also had a blunt laceration. Her skull contained both blunt force lacerations and three stab wounds. There were also areas where her hair was missing. The pattern abrasion adjacent to the crease in the ear was about three inches. Her neck contained small abrasions and three stab wounds. One of those stab wounds contained a knife blade, which was turned over to the police as evidence. The victim's left lateral chest contained seven stab wounds and another stab wound on the top of the victim's right shoulder. Six of the seven left lateral stab wounds penetrated the chest cavity, five of those perforated the left lung, causing it to collapse. There was no evidence of any injury to the victim's legs and feet, except for a violet purple contusion found on the right medial thigh.

¶ 33    On internal examination, he found bruises on the inside of the scalp and bleeding trapped inside the brain cover layer consistent with a subarachnoid hemorrhage and cerebral edema. The victim's cerebral edema was sufficient to force the brain stem into the opening at the base of the skull causing notching in the cerebellum. He stated this was evidence of significant trauma to the brain, consistent with injuries incurred in a beating or kicking.

¶ 34    After identifying the autopsy photographs, and the evidence provided to the police, Dr. Mitchell opined that Amy's death stemmed from closed-head injuries as a result of an assault consisting of both multiple blunt force trauma and stab wounds. After considering the boots

16

previously placed in evidence, Dr. Mitchell opined that the wound located on the right side of the head and on the inside of the victim's forearm was consistent with the boot, stating the tread on those boots was consistent with the pattern abrasions he saw on the victim's head. He further opined that most of the stab wounds were sustained as she was dying or even after she passed because there was not much evidence that her heart was actually pumping at the time the wounds were received.

¶ 35    On cross-examination, Dr. Mitchell agreed that the same injuries would be seen whether her assailant was 200 pounds or 250 pounds. He also agreed that her death would have been the same whether one or two knives were used. He stated that the tread pattern from the boot was consistent with the area behind the victim's right ear. He agreed that blunt force trauma could come from other items than a boot, including a baseball bat, crowbar, or table leg. He agreed that the blood found at the scene was likely from the injuries on the head and face and that he could not state which wound produced the blood on the ground. He confirmed that based on the coloration and shape of the injuries, they were contemporaneous and at least one kick was made to the head. He did not know the order of the stab wounds. He did not know how long the attack lasted, if it involved more than one individual, and did not know the exact time of death. He agreed that some attack victims may attempt to scratch or otherwise injure the attacker. He confirmed that he did scrape the victim's fingernails and gave the evidence to the police.

¶ 36    On redirect, Dr. Mitchell testified that the photographs of the crime scene were consistent with an attack. Items were strewn about the apartment. Blood was pooled on the ground, there was tracked blood, and there was blood sprayed around the room. He stated there was no evidence that some inanimate, blunt object was used. He opined that it looked "to be more of a beating with

17

possibly fists, or feet or shoes." He stated there were 38 clusters of injury solely related to blunt force trauma and 15 stab wounds.

¶ 37    James Clark testified that he was a Champaign police officer and in addition to his other duties worked as the supervisor for the crime scene unit. He responded to the victim's residence after hearing she was deceased. He confirmed that the officers donned gloves and booties to maintain the integrity of the crime scene. He stated that the amount of evidence obtained overwhelmed the capacity of the two tents, and a SWAT van was brought over to store and package evidence. Officer Clark was also in attendance at the recovery of evidence in the trash dumpster at Countrybrook Apartments. He identified his photographs and explained that a coat was found in the dumpster lying on top of other items. He agreed that the photographs revealed snow on the vehicles and ground. He stated the dumpster was open when they found it. There was snow on the trash but only a small amount of snow on the jacket. The officer identified the coat that was taken from the dumpster. As to the victim, he confirmed that hair was found on the front of her pants when they turned her over.

¶ 38    Joseph Gallo testified that he was a lieutenant with the Champaign Police Department and head of the SWAT unit. On January 29, 2004, they assembled a partial team and responded to the address provided at 7:35 p.m. after waiting in a staging area most of the afternoon. A perimeter was established around the residence. The suspect was later taken into custody without incident and transported to the Champaign Police Department.

¶ 39    Several officers and investigators testified as to their part in collecting evidence. Collectively, they obtained three socks, a knife blade and knife handle from the floor by the victim's right hand, a small piece of plastic believed to be from a knife handle, cigarettes from the snow outside the victim's door, a bloody napkin found a couple of inches from the top of the

18

victim's head, a blood standard from the victim, a blood standard from defendant, a sexual assault evidence kit, a second knife blade, a left Colorado boot, a right Colorado boot, a tan shirt, a black jacket, hair found on the victim's body, a VHS cassette, a broken VHS case, and telephone. Fingerprints were taken from the kitchen and the middle of Amy's front door. They also obtained gel footwear impressions between the kitchen and living room, at the bottom of the staircase, and near the victim's feet.

¶ 40    Aaron Small, a forensic scientist with the Illinois State Police (ISP) Forensic Lab in Springfield, Illinois, testified. He received the right Colorado boot, found in the dumpster at Pearlie's house, and confirmed there was blood and apparent hairs on the boot. He preserved the stain from the boot for later analysis. Blood was also found on the left Colorado boot, and he preserved the stain. Similar testimony was provided for the white sock and the black winter coat on which two stains were found on the front of the coat, one stain was found on the back left arm of the coat, and two stains were found on the neck area of the coat.

¶ 41    On cross-examination, Mr. Small confirmed that his list contained 41 lab exhibits. He agreed that he also received a sealed envelope with a cigarette butt. He agreed that someone who put their lips on a cigarette could potentially leave DNA traces, and no analysis was performed on the cigarette. He agreed that he did nothing to analyze whether there were fingerprints on the plastic handle of the knife, the knife blade, a VHS cassette, a broken VHS case, or the telephone. He further testified that he did not look at the partial print and fiber found on the wall and did not conduct any analysis on either. He agreed that he did not open the evidence bags that were placed around the victim's left foot, and right and left hand and provided no analysis on those items or the sexual assault kit that included vaginal and oral swabs as well as fingernail scrapings.

19

¶ 42    On redirect, Mr. Small stated that the evidence was related to a murder, not a sexual assault. He stated it was not economically reasonable to analyze every submitted item and a decision was made about which evidence would be analyzed. On recross, Mr. Small confirmed that his job was not simply to help the prosecution or determine what evidence helped a prosecutor. He agreed they were impartial, just performed the testing, and let the chips fall where they may. He stated that he was aware there was a struggle before the murder happened. He stated that some of the evidence was referred to a fingerprint expert.

¶ 43    Jennifer Aper, another forensic scientist employed with the ISP Forensic Lab, performed DNA analysis on the boots, the sock, and the jacket stains. All of the stains found on those items contained the victim's blood. On cross-examination, she stated that sweat did not contain DNA unless it came in contact with the skin; the skin cells would have DNA. She stated that samples were not taken off the knife blade, the knife handle, the cigarette butt, the telephone, the combings or swabs from the sexual assault kit, or the fingernail scrapings under Amy's fingernails contained in the sexual assault kit.

¶ 44    Krail Lattig was a forensic scientist with the ISP crime lab. Mr. Lattig compared the gel lifts and the boot comparison. The Colorado boots contained a deep tread pattern that included four-point, cross-shaped pattern. The boots could not be eliminated as having made the prints obtained from Amy's apartment. He stated the shoe prints were of very poor quality. He further testified that all the knife and handle pieces did not fit together. One of the knife blades fit into the handle. The other handle piece and blade were parts from a separate knife.

¶ 45    On cross-examination, Mr. Lettig confirmed that the boots could have made the impressions seen in the gel tabs, but for a variety of reasons, he could not say those were in fact the boots. For example, he could not determine the size of the boot in the impressions. He agreed

20

a lug type pattern on boots was not particularly unusual. Following Mr. Lettig's testimony, the State advised the court and defense counsel, outside of the jury's presence, that a fingerprint report was prepared by the lab and would be faxed over to her office.

¶ 46    Mark Strzesak was a detective with the Champaign Police Department. Detective Strzesak interviewed Maggie and was later contacted by Leigh Ann Borkowski. He explained that at that time defendant's name began to surface. He learned that defendant was taken into custody around 7:55 p.m. on January 29, 2004. He and Detective Kelly interviewed defendant at the police station. The interview began at 8:23 p.m. Defendant was advised of his rights and agreed to speak with the detectives. The detective identified a map of Champaign and stated that defendant referred to a number of different places he had been on the evening of Amy's death. Defendant stated that he started at his cousin's house and was picked up by Leigh Ann. They drove to Cowboy Monkey. From there, Leigh Ann and defendant went to Tommy G's. When they left, they went to Leigh Ann's residence. Defendant left her residence on foot and stopped at Chesterbrook Academy which was approximately 0.7 mile away. From there, defendant stated that he walked to Linda Brown's apartment, approximately 3.1 miles from the Academy. Defendant called a cab to pick him up at Linda's apartment and he was dropped off somewhere near Bellefontaine, Roper, and Market Streets. Defendant stated he was an addict and was looking to find drugs. From there, defendant was picked up by two people in a pickup truck and they drove around looking for drugs until they dropped defendant off at Pearlie Mae Williams' house. Later during the interview, defendant mentioned that he stopped by the residence of Mr. Britt. During the conversation, defendant was asked if he knew anybody by the name of Amy. He came up with two Amys, one of which was the victim. Defendant stated he last spoke with Amy a couple of weeks earlier, but then stated he might have had a conversation with her when he called her from Mr. Britt's house.

Defendant stated that he went to Mr. Britt's house before he went to Pearlie Mae's house. The detective marked all the locations on the map where defendant stated he had been on the evening of January 28, 2004, and the morning of January 29, 2004. The detective indicated that it was 0.3 mile from Mr. Britt's house to Amy's house. It was 1.2 miles from Amy's house to Pearlie Mae's house.

¶ 47    Defendant later stated that he and Amy had a sexual relationship and the last time he had seen Amy was approximately two weeks earlier. He denied seeing Amy on either January 28 or January 29, 2004. He also denied being at her residence on either of those dates. The detective identified the tape containing parts of defendant's interview, and the transcript from that interview. Thereafter, the tape was published to the jury with no objection but was qualified with an instruction prepared by defense counsel. The partial tape lasted approximately 1 hour and 15 minutes. Thereafter, the court took a recess.

¶ 48    Court resumed, and Detective Strzesak testified that defendant mentioned that he was also with Larry Chapel who was later determined to be Larry McGowan. The detective explained that defendant stated he was with McGowan and James Powell and was picked up on Kimberly Avenue. The additional locations, including the Countrybrook Apartments, were marked on the map. The detective testified that defendant was taken to the county jail following the interview and his clothes were placed into evidence. The clothes included a pair of jeans, a gray U of I sweatshirt, a members-only off-white jacket, a pair of black and blue FUBU shoes, and a black knit face mask and stocking cap. The detective stated that defendant was 5 feet 10 inches, 200 pounds.

¶ 49    After the interview, the detective went to Pearlie Mae's residence and conducted a search of her premises. He stated they did not find anything of evidentiary value in the apartment. He and

22

Detective Kelly also searched the outside of the building and found a dumpster on the south side of the apartment building. He stated that one of the bags contained what looked to be a boot and the detectives notified crime scene technicians to photograph the area. Thereafter, the detective took the garbage bag to the police station for evidence processing. He stated the bag contained normal household garbage as well as two boots and an off-white short sleeved buttoned shirt. The boots contained very large brownish stains. The shirt also had a brownish-colored stain. The detective stated that he spoke with Ms. Williams, James Powell, and Leigh Ann Borkowski, on that date as well.

¶ 50    On cross-examination, the detective agreed that Leigh Ann advised him of her telephone contact with defendant. She did not tell him that defendant told her the police were looking for him in regard to a body. The detective stated he learned of that later. He was unsure if anyone ever talked to Linda Brown. He further indicated that he was not the officer that verified defendant's identity with the cab company. He agreed that someone spoke with the cab company and that Mr. Britt's address was verified. He agreed that phone records confirmed a call from Mr. Britt's house to Amy's number around 4:21 a.m. on January 29, 2004. The investigation team also verified that defendant went to Pearlie Mae's house on the morning of January 29, 2004. The detective stated that he looked at defendant's hands during the interview and did not observe any cuts on defendant's hands and did not see any obvious cuts when he took off his clothing. Following the detective's testimony, court was ended for the day and the parties addressed possible jury instructions.

¶ 51    The following day, August 19, 2004, the parties presented two stipulations. The first was related to John Karnes and would be read in the State's case. The second involved Ameritech records and would be read in defendant's case. The jurors returned and the stipulation regarding

23

John Karnes was read to the jury. It stated that if Karnes was called to testify, he would testify that he was a forensic scientist specializing in the analysis and comparison of latent fingerprints. He reviewed a vinyl jacket, a small piece of dark plastic, a piece of semi clear plastic, a knife blade, a second and third piece of semi clear plastic, a telephone, a piece of wall, a second knife blade, a plastic handle, and latent fingerprints from the victim and the defendant. An examination of those items revealed no latent prints suitable for comparison. Thereafter, the State moved to admit its exhibits for which no objection was raised and rested.

¶ 52    Defendant moved for a directed finding, arguing that the evidence failed to rise to a level of a *prima facie* case to go to the jury. The State responded that the DNA evidence should be determined by the jury. No rebuttal was provided, and the court denied the motion. When the jury returned, the court read a stipulation that agreed and stipulated the following concerning telephone records from Ameritech. Amy's phone revealed the following calls on January 29, 2004: (1) a telephone call received at 1:32 a.m. lasting 26½ minutes from Mike Berry; and (2) a telephone call received at 4:21 a.m. lasting 1 minute and 8 seconds from Mr. Britt's residence.

¶ 53    Defense counsel called Lamar Adams who testified that he lived with Andre McGovern across the hall from Linda Brown in January 2004. He stated that he heard a knock on the door and let defendant into the apartment. He stated that defendant was at his place for about an hour, drinking with them. Defendant stated that he needed some money so he could get home. Mr. Adams testified that defendant made a call for a cab and left 40-45 minutes later. He did not see defendant get in a cab, but he heard the cab arrive. He stated defendant was at the apartment for approximately one hour.

¶ 54    On cross-examination, Mr. Adams stated that he did not recall what defendant was wearing that night. He only knew defendant wore a dark coat and dark pants. He did not remember the

24

boots. He saw defendant have one or two drinks while he was at the apartment. They were drinking Captain Morgan and Coke. Defendant showed him a ring in his pocket that was gold with a purple diamond. Defendant asked him to hold the ring in exchange for cab money. Mr. Adams gave defendant $20. Although Mr. Adams agreed that he was only holding the ring for defendant, he did not know the ring's current location. On redirect, Mr. Adams stated that he heard knocking on the door around 1:30 or 2 in the morning and confirmed defendant was there for about an hour.

¶ 55    Mick Fair testified that he was a cab driver for Yellow Checker Cab. He received a call from dispatch on January 29, 2004, between 2:55 and 3 a.m. He arrived at the location 5 or 10 minutes later. When he got there, the passenger stated he wanted to go to the north end of town. He turned the meter off about halfway through the trip because the rider was concerned that he would not have enough money to pay the fare and there would be no argument about the fare. They went to a location and the rider got out but asked the cab driver to wait around. The rider went up to a door and nobody answered. They then proceeded to another location around the block and the same thing occurred. They then went another two blocks west and did the same thing. About the same time, while they were on North Neil Street, a dark blue or black SUV arrived. The rider walked up to the SUV and then came back. The cab driver charged defendant $10. Defendant paid the amount and then went back toward the SUV. The cab driver left. He said he drove the rider around for 20-25 minutes at most. The cab driver identified the rider as defendant.

¶ 56    On cross-examination, Mr. Fair agreed that defendant was his last call of the night. He stated that he usually worked a 12-hour shift. He did not charge the rider in the usual way because the rider was haggling back and forth with him. The rider paid with a $20 bill and the driver gave him a $10 bill in return. Mr. Fair stated the weather was extremely cold that night with the temperature in the single digits. Defendant was wearing a dark jacket and possibly dark

25

sweatpants—like jogging or nylon pants. He was also wearing tan work boots. He was unsure why defendant wanted to go to the north side. The witness marked where he dropped off defendant on the State's map. On redirect, Mr. Fair stated he did not see defendant go into any house. He stated that he had been to those particular homes, usually at night. He believed they were possible crack houses or drug spots.

¶ 57    Matthew Henson was a police officer for the Champaign Police Department who investigated the crime scene on January 29, 2004. He spoke with Mr. Chin, the owner of the apartment. The officer agreed that Mr. Chin made a statement that he was in Amy's apartment on Sunday, January 25, 2004, at which time he saw a black male sleeping on the bed. He further told the officer that he was awoken by banging on the basement door around 3 a.m. and looked out the window and saw two black males. He described the men as one being between 5 feet 8 inches and 5 feet 10 inches tall, wearing dark clothing. He also saw a shiny black car.

¶ 58    Patrick Kelly was a detective with the Champaign Police Department. He interviewed Danielle Miller at the police station. He agreed that Danielle stated that she saw an individual outside her window two times the evening of Amy's death. During the second time, she indicated that she looked at the person and remembered him as someone she had seen before. The officer agreed that Danielle stated the person's hair was short and lined out like a black man's haircut. She told the officer that she believed the man's name was Mike. She stated that she would not be nice to the person if she saw them in the lineup because of what he had done to Amy. She was shown a photo lineup with six individuals—all the same race and build. One of those photographs was defendant and Danielle was unable to make an identification out of those six pictures. He agreed that Danielle stated that she knew for sure that it was none of them. She later indicated that it might be easier for her to make an identification if she could see the person walking. He gave

26

Danielle his card and asked her to call her if she thought of anything else. The only other time he saw Danielle was when he told her they had made an arrest.

¶ 59    On cross-examination, the detective agreed that Danielle indicated that she could be wrong in stating the person's name was Mike. She stated she did not know for sure because Amy had three friends or acquaintances named Mike. The detective testified that the photograph from the lineup of defendant was taken October 19, 2002, and in that photograph, defendant had hair. All of the photographs for the lineup included black males of the same age range who had relatively close-cut curly Afro-style hair. All the men in the photographs also had facial hair. He stated that they used subjects that were similar to defendant for the photographs. None of the photographs showed the person's body. The detective stated that Danielle indicated that she saw the person from a distance and the photographs were all close-ups. She stated that she would be more comfortable with an in-person lineup because she saw the whole-body shape, size, the way they moved, and that was what she was familiar with. She could not make the identification solely from a close-up photograph.

¶ 60    On redirect, the detective again confirmed that Danielle stated that she knew for sure the person at Amy's house was not in one of the photographs. He stated that he told her to disregard any temporary features like hair length, style, color, acne, scratches, cuts, or bruises. She described the person as having short hair. She did not say he was bald.

¶ 61    Defendant testified that he was 43 years old and graduated high school. He was born and raised in Chicago, Illinois, and had two brothers and two sisters. They all lived with his mother. Defendant moved to Champaign in 1971-72, before he graduated from high school in 1978. He was not married and had one 17-year-old daughter, who lived in Urbana. He addressed his prior criminal history and stated he was on parole when he was arrested in January 2004. Defendant

27

agreed that he participated in the interview with Detectives Strzesak and Kelly in late January 2004 and tried to be cooperative. He stated that there were a couple of mistakes he made during the interview. He stated that during the interview he told officers that he got the $20 from Bubba Shelby but it was from Lamar Adams. He stated that he only later learned the man's name. He stated he was not trying to mislead the officers and gave them the correct address and apartment number. He also made a mistake by telling the officers that he got a ride from Larry Chapel. He later learned that Larry's name was actually Larry McGowan. He agreed that was the person who testified several days ago. He again stated he was not trying to mislead officers he just did not know the correct name.

¶ 62    Defendant stated there were a couple of times he was not honest with the officers. He told the officers that the clothes he was wearing during the interview were the same as the ones he wore the night before. But, in fact, he had been wearing different clothes the night before. He also stated that when he was asked if he had been at Amy's apartment, he said no, and that was not correct either. Defendant stated he had been at her apartment that night.

¶ 63    In January 2004, defendant was living on Melinda Street and dating Leigh Ann Borkowski. They met the previous May when Leigh Ann gave him her number. He agreed it was the same woman who testified previously during the trial. He stated that he and Leigh Ann had a sexual relationship, but he also had a sexual relationship with Amy. Amy and Leigh Ann did not know of each other. He stated that he lived with Leigh Ann from June to October 2003, and he later moved in with his cousin on Melinda Street. He agreed that the map properly showed the location of Leigh Ann's house. He agreed that they bought each other things. She bought him a black knit cap. He stated that he and Leigh Ann got together on January 28, 2004, between 7:30 and 8 p.m. Leigh Ann picked him up and they went to Cowboy Monkey, where they stayed about an hour and a

28

half. He stated he had three rum and Cokes and a shot of Hennessey. He said Leigh Ann was already drunk when she picked him up and had more to drink at Cowboy Monkey. They then went to Tommy G's. Defendant stated that he drove Leigh Ann's car and it was her idea to go there. They were there between a half hour and 45 minutes. She had a drink at that establishment too. He stated that she did not indicate that she was breaking up with him at Tommy G's. Defendant decided that it was time for them to leave. He asked her to take him home. Instead, they went to her house because she drove and wanted him to stay the night. He kept telling her that he did not want to be around her and wanted the relationship to be over. He stated that he broke up with her. She did not break up with him. He stated that she kept trying to get him to spend the night and he asked for her to give back the ring because it was over. He stated that he was at Leigh Ann's condo for 20 to 25 minutes. She never agreed to drive him home. He did not have any money and stated Leigh Ann bought all the drinks that night. He did not have his wallet with him that night. After she said she would not drive him home, he walked south on Duncan. He agreed that was not the direction of his house but stated he was not ready to go home and was just trying to go over to a friend's house. He went to Linda Brown's house. He stated it was a cold walk. He was wearing a black skull cap, a hooded sweatshirt, his Illinois shirt, black jacket, black sweatpants, and tan boots. He stated the gray sweatshirt was hooded. He was not wearing a face mask with holes; that belonged to his cousin. He left Leigh Ann's house between 12:30 and 12:45. He was hoping he could call for a ride at the daycare (Academy) where two people were cleaning. He knocked on the window, but the people inside would not let him in. They did let him use a cell phone and he called his cousin for a ride, but she would not pick him up. She told him it was 1:30 a.m., she was in bed, and her son was asleep. He then continued to Linda Brown's house and stated it took about an hour and 15 minutes to get to her apartment. He thought it was between 2 a.m. and 2:15 a.m.

29

when he arrived. He testified that his mother's house was closer than Ms. Brown's apartment, but he "would never go to my mom's house at that time of the morning." He knocked on Linda's door and used her phone. He called a friend in Rantoul. After the call, he asked Linda if he could borrow some money and she said she did not have any. He heard sounds across the hall from Linda's apartment and asked her if she thought one of those people could give him a ride. She said she knew one of the guys but could not remember his name.

¶ 64    Defendant knocked on the door across the hall and Lamar Adams let him in. He stated he had never met Lamar before then but was at that apartment for about an hour after they realized they knew similar people. He asked for a ride and both people said they had been drinking and said no. He then asked them for money and offered the amethyst ring as collateral. He got $20 and called for a cab around 3 a.m. He got into the cab once it arrived and directed the cab driver to a house where defendant knew they sold drugs. He was unable to purchase drugs at either the first or second location and eventually paid the cab driver $10 for his fare. At the third location, he saw a black truck or SUV and knew the female passenger and asked for a ride. They then went to another location to try to get drugs but were unsuccessful. He stated that he had not used drugs for two years but had a bad night and was going to relapse. He said they drove around for 15 to 20 minutes, and the driver got tired of driving them around, so he got out at the corner of Beardsley and Neil Streets. He then walked to Mr. Britt's house and around 4:15 a.m., he knocked on the door and was let in. He called the victim, Amy, around 4:21 a.m. to see if he could stay at her place and have her drop him off on her way to work. He said they were friends. Whoever answered the phone at Amy's house said it was fine for him to come over and he said he would be over in a little while. He said Amy's house was about 3½ to 4 blocks away. He said he took the gray sweatshirt off at Linda's house because her apartment was hot. He only had his coat when he went across the

30

hall to Lamar's apartment. He stayed at Mr. Britt's house for about five minutes and left between 4:35 and 4:40 a.m. The walk took him about five minutes. He stated that he never met Amy's landlord or the two girls that lived upstairs. He said he did know Mike Brown was Amy's friend but never met the other two people named Mike that she knew.

¶ 65    Defendant stated he got to Amy's house around 4:45 a.m. He said the door was open about a foot wide. He yelled down to Amy to tell her he was there. He said he got no response. He then went downstairs and headed toward the blue light coming from the television. He stated that once he got downstairs, he first thought she was lying on the floor watching television because he saw the blanket. He asked what she was doing there but got no response. He then walked towards the kitchen and flipped the light on and turned around. He saw blood and her eyes were popped out like she was gasping for air. He was concerned for her, so he went over to her, knelt down by her, held her hand, and asked what happened. She said in a whisper what sounded like Manuel and just collapsed. He said he was on Amy's left side and her face was toward the coffee table. After they got discovery from the State, he realized Amy could have said Daniel or Danielle. He said he held Amy's head in his arm. After that, he laid her back down, stood up, started shaking his hands, and freaked out. He had blood on his hands. When he knelt down, his pants were on the ground, and he did not recall stepping in a manner that would avoid stepping in blood. He agreed he may have gotten blood on his pants and his boots. He agreed that he was wearing the black jacket and tan boots that were taken into evidence. He was shaking his hands but was unaware if any blood shook off them when he did it. He remembered touching the lapel of his coat. He remembered thinking he should call the police and walked toward the phone. However, he did not call 911. When asked why not, defendant stated, "I'm a black man, at five o'clock in the morning in a white woman's apartment, dead white woman's apartment, with blood on me. I'm on parole, I'm not going to call

31

the police." Instead, he turned around and ran. He stated he did not try to clean anything up at the scene, her body, or himself. He stated that he did not touch anything and did not see the knife handle or blade. He was in Amy's apartment no longer than a minute or two. He stated he walked out the same way he came in and left the door partially open.

¶ 66   Defendant ran out, turned right, ran east down Randolph Street, and turned south. He decided he needed to get out of his clothes. He headed to the Salvation Army on First Street and found a pair of blue corduroy pants and a yellow shirt behind the building and took them. He put them on and put the clothes he was wearing in the bag that previously held the blue pants and yellow shirt. He still had on the black jacket and tan work boots. He stated that he never looked at the pants he originally had on but figured there was probably blood on them. He also never looked to see if there was blood on his boots. After he left the Salvation Army, he went to Pearlie Mae Williams's house. He said he got to her house around 5:30 or 5:45 a.m. and Ms. Williams let him in. He stayed at Ms. Williams's house until about 12:30 p.m. He did not tell her what he saw at Amy's house because he did not want to get anybody else involved. It was there that he noticed he had blood on his boots and started throwing up. He knew he needed to get out of all the clothes he had on. He took the blue shoes from Ms. Williams's closet and put his boots in the trash. When he left Ms. Williams's house around 12:30 p.m., he jumped on a bus and was just riding around trying to clear his head. He said he bought $10 worth of bus tokens and was on the bus for a couple of hours. He eventually got off the bus near Holiday Park where his mother lived and ended up at James Powell's house around 3 p.m. His mother lived about a block and a half away. He stayed at Mr. Powell's house from about 5:45 p.m. to 6 p.m. He did not tell Mr. Powell about what he saw at Amy's house. He said he called his mother four times from Mr. Powell's house but got no answer. He did not have a key for his mother's house. He tried to get on a few buses but missed

32

them and was just trying to bide his time until his mother got home. He left Mr. Powell's house around 6 p.m. and ran into Larry McGowan and asked for a ride. Mr. McGowan's wife and child were in the car, and he asked for a ride to his house. He got out of the car and went into his house. At some point later, Mr. McGowan gave him a ride to Countrybrook where he put his coat in the dumpster. He stated he was not worried about the cold at that point because he was in a warm car and was going home. Mr. McGowan took him home and he got there around 7:30 p.m. He talked to his cousin at the house but did not tell her what he saw at Amy's house. His cousin told him that he needed to call the police station because the police were looking for him. He then called the police and spoke with the dispatcher and said he was coming to turn himself in. When he stepped out his front door, police were already there, and he was taken into custody. Once he was taken to the police station, he started his interview with Detectives Strzesak and Kelly. He stated that although he did not tell them he was at Amy's house, almost everything else he told the police was accurate. He stated that he did not tell the police that he was at Amy's house and did not commit the crime because Amy's death was not the reason the police took him to the police station.

¶ 67    Defendant stated that he was not banging on Amy's door at 3 a.m. He never banged on Amy's door. He stated he did not cause the mess at Amy's house and did not touch anything at Amy's house. He stated he did not touch the wall with his bloody hand. He did not have any cigarettes with him that night. He did not leave any of the cigarette butts found outside Amy's door. He stated that he did not get into a physical altercation with Amy that night. He did not kick, hit, stab, or kill her.

¶ 68    On cross-examination, defendant stated that he told the officers "Oh my God" when they told him Amy Smith had been found dead because he did not want them to link him to her apartment. He said he was surprised and was hoping she was not dead. He disputed that he knew

33

she was dead. He did not see the knife blade in Amy's neck when he cradled her head or that her forehead was ripped off. All he saw was blood all over everything and heard her say Manuel or Danielle or something like that. At that point, Amy just collapsed in his arms, and he laid her down. He had no idea she was dead. He was just hoping she was alive and that was why he left the door open. He was scared and that was why he left a living person who could have received help. He agreed that he did not call an ambulance or the police even though she was a friend because he was scared, and they would assume he had done it. Even though Amy was someone he had an intimate relationship with, he said he did not call because he was "on parole." His fear was what prevented him from saving her life or even trying to save her life. He would have tried to call for help, but he had her blood on him. He was not sure if she was still bleeding when he was there. He stated his coat was zipped and he did not pull the body that close to him. He was only holding her head while he was on his knees. He agreed that he stood and looked at the phone in Amy's apartment and thought to himself, "if I call the police are they going to think that I did this, or should I just get the hell up out of here." He chose the latter and told no one. When asked how he got blood drops on the back of his coat, defendant stated, "When I flinged my hand, I'm not sure." He stated he did not know how he got blood on the top of his shoes. He thought maybe that happened when he was shaking his hands. When asked again how blood got on the back of his coat, he stated, "Well, I couldn't tell you. Maybe it flew up in the air and came down." He did not know if there was blood on the inside of his sleeves. He had blood on his hands until he got to Ms. Williams's house. He said he went straight into the bathroom. He stated that he also picked up snow and washed his hands. He again confirmed that he lied to the detectives about not being at Amy's house and the clothes that he was wearing the evening before. He did not consider his other omissions because the detectives did not ask him. However, if they had asked, he "probably" would

34

have lied. When asked if he cared about Amy, defendant said, "She was a nice person." When asked a second time, defendant said, "Sure, yes, I did." When asked why defendant previously testified that he was ready for a drug relapse because he had a bad night when he was the one who broke off his relationship with Leigh Ann, he stated that he and Leigh Ann got into a little confrontation.

¶ 69    On redirect examination, defendant reiterated that he had no idea how blood got on him except for shaking his hands. He stated that only at the end of speaking with the police did the conversation turn towards linking him to the murder. He agreed that nobody else, including Mr. Chin, Danielle, and Maggie, had called 911 either. He stated that he did not say anything about Amy's murder at the end of the police interview because he wanted a lawyer present. Thereafter, defendant rested.

¶ 70    Following the lunch recess, a stipulation was provided regarding Leigh Ann Borkowksi's testimony, and the State provided rebuttal testimony. The stipulation indicated that Leigh Ann purchased a black knit skull cap for defendant prior to January 29, 2004, and he was wearing that cap when they went out on the evening of January 28, 2004, although Leigh Ann testified that the cap in evidence was not the one she purchased, or the one defendant wore that night.

¶ 71    The State's rebuttal evidence included a stipulation regarding the chain of evidence related to defendant's boots and testimony from David Carter. Sergeant Carter worked for the Illinois State Police and was a blood stain pattern analyst and blood stain expert. He explained that blood spatter was a term used to describe patterns created when blood is transferred by force. It is now called blood stain pattern and that is further classified as one of four categories: physical contact, wiping, swiping, and impact. Impact stains were produced when a blood source was impacted by force. Sergeant Carter investigated the blood found on the brown leather boots. He confirmed that

35

blood was found on the tops of the boots. He noted transfer contact patterns on the right boot, which was where blood actually came into contact with the surface and stuck to the surface. The right boot indicated that it not only contacted a bloody surface but was moving at the time it made contact, causing the blood to move in a pattern and direction. The very small stains on the side of the boot and across the toe were consistent with impact spatter, meaning it was moved under force. He explained that the more force applied to a drop of blood, the faster it propelled away from the source, creating smaller droplets. The measurements on the right boot were one millimeter, which told him the force applied to the blood to break it down to the size of these stains would have been somewhere in the category of a hundred feet per second, which was high velocity. He also noticed another stain on the right side of the right boot which indicated a lower velocity blood drop. As to the left boot, it had a larger amount of blood present. It also had contact patterns where blood came into contact with the boot and had a larger series of impact pattern stains. He said the left boot was closer to the blood source and actual impact site than the right boot. He also noted that given the amount of blood seen on the left boot there was impact between two stains and therefore there was a possibility that some blood covered the impact pattern. The left boot contained both one-millimeter and two-millimeter stains. The one-millimeter stains were consistent with medium to high impact stains. The two-millimeter stains were consistent with medium impact.

¶ 72   Sergeant Carter was asked to assume, regarding the boots, if a person held the victim's head in the manner described by defendant, stood up in an upright standing position or bending forward at the waist and repeatedly shook his hands in a downward fashion, would cause the blood stains seen on the left and right boots. He responded, "No, that motion could not have produced these stains." He explained,

"Large drops progressively form on the fingers, and you leave a dot pattern in a linear progression. Castoff stains are identified by dot patterns of linear progression, usually, and we can even tell the arc of them based on the elongation of the stains. If I was to take my hand and stand right here and swing it with blood against this wall, or swing it across this floor, the stains on each end would be elongated, because they strike on that angle I was telling you about. The stains here are circular, 90 degrees, but in no circumstance, unless we are swinging something that is a very pinpoint object, in no circumstance can you create one-millimeter stains by casting off of your hands."

¶ 73    On cross-examination, Sergeant Carter agreed that he did not visit the crime scene and did not perform triangulation. He further agreed that he did not measure the depth of the blood stains, never examined the body, and did not test any of the blood on scene. He also agreed it was possible that blood was on top of other blood on the left boot, but that no testing was available to confirm that fact and he instead used logic. He did not know if the boots were treated with water repellant. He disputed that any of the droplets on the boots came in at a 45-degree angle. He agreed he did not test every spot on the boots.

¶ 74    On redirect, Sergeant Carter stated it was not necessary to test every droplet in a particular area, like those seen on the boots, to determine blood flight pattern. He stated that he tested a representative sample of each. Thereafter, the State rested.

¶ 75    The following day, closing arguments were provided, the jury instructions were read, and the jury was sent to deliberate. Later that morning, the jury sent back three questions. The first asked, "How long has the defense team been in place?" The second asked, "Could they have asked for certain items to be tested for DNA? (the defense team)" The third asked for flip chart paper

37

and markers to make a timeline. The court responded, with counsel's agreement, to state, "You have all the evidence in the case. Please continue to deliberate." The requested materials were provided. Approximately three hours later, the jury found defendant guilty of first degree murder and that during the commission of the offense, defendant's conduct was exceptionally brutal and heinous, indicative of wanton cruelty.

¶ 76    Posttrial motions and sentencing were addressed on October 4, 2004. The court denied the posttrial motions. Following the presentation of evidence and argument, the trial court sentenced defendant to a term of natural life imprisonment.

¶ 77    Defendant appealed his conviction and sentence, raising several issues. *People v. Horton*, 371 Ill. App. 3d 1224 (2007) (table) (*Horton I*) (unpublished order under Supreme Court Rule 23). Upon review, the appellate court disagreed with all of defendant's arguments and confirmed his conviction and sentence, notably finding, in its plain error review, that the evidence was not closely balanced. *Id.*

¶ 78    While the direct appeal was pending, defendant filed a *pro se* motion for forensic testing. Therein, defendant requested testing on 11 items that included two cigarette butts, hair found at the crime scene, the telephone, socks, the bloody fingerprint on the wall, the plastic knife handle, a tissue with suspected blood, swabs from a bathroom sink, a white hand towel, a tan sport shirt with suspected blood, the bags sealing the victim's hands and feet, vaginal, anal, and oral swabs, hair combing, fingernail scrapings, Amy's blood standard, a sealed envelope containing latents, and two "unknown items" identified solely by the location where they were found. On June 1, 2006, the trial court issued an order denying defendant's motion, finding it did not meet the statutory requirements and was deficient on its face. More specifically, the order found the motion

38

failed to allege or state any factual basis to support a claim that "the technology for DNA testing being sought by the Defendant was not available at the time of the trial."

¶ 79    On November 7, 2007, defendant filed a *pro se* postconviction petition. *People v. Horton*, 396 Ill. App. 3d 1141 (2010) (table) (*Horton II*) (unpublished order under Supreme Court Rule 23). The petition claimed his trial counsel was prejudiced against him and provided ineffective assistance of counsel. *Id.* The *pro se* petition claimed—*inter alia*—that trial counsel was ineffective due to his failure to seek forensic testing of certain crime-scene evidence. *Id.* Defendant also argued that his appellate counsel was ineffective for failing to raise on direct appeal trial counsel's ineffectiveness in failing to seek forensic testing on certain items of evidence. *Id.* Appointed counsel's amended petition included this claim, among others. *Id.* The petition was dismissed at the second stage and defendant appealed. *Id.* On appeal, defendant claimed his postconviction counsel was ineffective in the presentation of his postconviction petition and that his trial counsel was ineffective. *Id.* The appellate court disagreed and affirmed the dismissal of the postconviction petition. *Id.*

¶ 80    On August 19, 2010, defendant filed a *pro se* petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2010)), alleging his judgment was void. On November 19, 2010, the State moved to dismiss the petition, and on January 11, 2011, the trial court issued an order granting the State's motion and denying defendant's petition. Defendant appealed. *People v. Horton*, 2012 IL App (4th) 110086-U, ¶ 14 (*Horton III*). The appellate court affirmed the dismissal after the Office of the State Appellate Defender (OSAD) moved to withdraw, claiming no meritorious claim could be presented. *Id.*

¶ 81    On April 2, 2012, defendant, through representation by the Downstate Illinois Innocence Project, filed a petition for postconviction forensic testing pursuant to section 116-3 of the Code

of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2012)). The petition noted the previous denial of defendant's May 2006 request for forensic testing and stated the prior basis for previous denial was now excluded in the amended statute. The petition requested DNA testing of the following items: (1) fingernail scrapings collected in sexual assault evidence kit—Exhibit 33G; (2) light tufts of hair found on the victim's body at the crime scene—Item #60; (3) black plastic knife handle and hairs and fibers found thereon—Exhibits 44 and 42A; (4) tooth piece found on victim's body—Exhibit 15; (5) cigarette butts found in victim's apartment—Exhibit #1; and (6) hair found near victim's legs—Exhibits 56 and 57.

¶ 82    Once the record on appeal was returned following the issuance of the decision in *Horton III*, the State advised the court that an agreement was reached on defendant's pending petition for forensic testing. On May 16, 2013, the parties presented an agreed order providing for testing by a private contractor. The items that would be tested included: (1) the fingernail scrapings from Amy's sexual assault kit (Exhibit 33G), (2) the plastic knife handle (Exhibit 42); (3) the hairs and fibers found on the plastic knife handle (Exhibit 42A); (4) blood standard from Amy Smith (Exhibit 33A); (5) blood standard from defendant (Exhibit 41); (6) the hair tufts found on the victim's body (Item #60); and (7) the tooth piece found on the victim's body (Exhibit 15).

¶ 83    On July 15, 2016, defendant moved for leave to file his first successive petition for postconviction relief. The motion claimed that newly discovered DNA evidence demonstrated defendant's actual innocence, which was material, noncumulative, and would change the result on retrial. In support, the motion relied on the DNA results that revealed that testing from the scapings obtained from under the victim's left-hand fingernails contained material that excluded defendant as a possible contributor to that DNA material. Attached to the motion was a proposed first successive postconviction petition. Attached to the petition were the DNA testing results that

40

revealed no profile was obtained from the right-hand fingernail clippings or the hair on the black knife handle. The left-hand fingernail clippings excluded defendant as a contributor. The black knife handle swab contained a mixture of DNA from two males and no determination could be made as to whether defendant was a contributor to the mixture. The partial DNA profiles obtained from the hair found on the front of the victim and the tooth was consistent with the victim's profile. Also on July 15, 2016, defense counsel from the Innocence Project filed a petition for postjudgment relief pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)). The petition was also based on the DNA results.

¶ 84   On August 3, 2016, the trial court granted defendant's petition to file a successive postconviction petition. The trial court's docket entry order also provided a briefing schedule related to the pending pleadings. The petition for postconviction relief was filed on August 11, 2016. On December 1, 2016, the State moved to dismiss defendant's section 2-1401 petition for postjudgment relief. Therein, the State argued that defendant failed to show the new evidence was material and, even if he had, the evidence was not of such conclusive character that it would change the result on retrial. The State also filed a motion to dismiss defendant's first successive postconviction petition for similar reasons. On June 29, 2017, the trial court entered a 17-page order dismissing the successive petition for postconviction relief and denying defendant's section 2-1401 petition. On July 28, 2017, defendant moved for reconsideration of the June 29, 2017, decision. The trial court denied the reconsideration request on August 2, 2017, and defendant appealed the decision.

¶ 85   On appeal, defendant argued that the trial court's dismissal of defendant's successive postconviction petition was error. *People v. Horton*, 2020 IL App (4th) 170643-U, ¶ 3 (*Horton IV*). He further argued that he was denied reasonable assistance by postconviction counsel. *Id.* As

to the first claim, and relevant here, the court found the " 'DNA, in and of itself, does not confirm the commission of a crime, rather, it confirms an individual's identity' " and that the evidence did not exonerate defendant. *Id.* ¶ 52 (quoting *People v. Rivera*, 2011 IL App (2d) 091060, ¶ 31). The court further noted that the record failed to support defendant's contention that the victim clawed, scraped, or scratched her killer. *Id.* ¶ 57. Therein, the court addressed Dr. Mitchell's testimony and the victim's injuries that "were indicative of her attempt to shield her body from the objects used in her murder." *Id.* The court found there "was no evidence of Smith clawing or scratching her killer" and Dr. Mitchell administered the sexual assault testing because it was " 'standard kit for this type of incident' " and not because the victim may "have clawed or scratched her offender as defendant asserts." *Id.* Accordingly, the appellate court affirmed the trial court's finding that the new DNA evidence was not material. *Id.* ¶ 58.

¶ 86 The appellate court also addressed the trial court's finding that the new DNA evidence was not of such conclusive character that it would probably change the result on retrial. *Id.* ¶ 60. After addressing the evidence at trial (*id.* ¶¶ 62-65), the appellate court held that, "Given the overwhelming evidence establishing defendant's guilt, we cannot find the absence of defendant's DNA underneath Smith's left-hand fingernails to be of such conclusive character that it would probably change the result on retrial" and affirmed the trial court's order of dismissal. *Id.* ¶ 66.

¶ 87 On October 4, 2021, defendant filed a motion for genetic marker and/or DNA database search of the DNA evidence. On October 7, 2021, the trial court issued an order denying the request, specifically relying on language related to the DNA evidence in the *Horton IV* decision. On October 22, 2021, defendant moved for reconsideration, and on October 28, 2021, the trial court denied the motion. Defendant timely appealed the decision. Defendant's appellate counsel, OSAD, moved to withdraw, asserting there were no meritorious issues to present on appeal. *People*

*v. Horton*, 2022 IL App (4th) 210672-U, ¶ 2 (*Horton V*). The appellate court agreed, granted the request to withdraw, and affirmed the trial court's order. *Id.* In doing so, the appellate court stated the following:

> "We additionally concluded the evidence establishing defendant's guilt was overwhelming. DNA tests results showed the blood on defendant's boots, left sock, and coat matched Smith's DNA profile. Defendant attempted to dispose of these clothes after leaving Smith's apartment. Further, the tread pattern on defendant's boot was consistent with the pattern abrasion on Smith's skull. We note '[t]he collateral estoppel doctrine bars relitigation of an issue already decided in a prior case.' [Citations.] Because we have already considered and rejected defendant's contention regarding the materiality of the DNA evidence at issue, we find the trial court did not abuse its discretion in denying defendant's motion for a DNA database search." *Id.* ¶ 28.

¶ 88    On January 3, 2023, defendant filed a petition for postconviction forensic testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2022)). In support, defendant argued that none of the materials requested for testing were subjected to testing at the time of trial or thereafter. He further asserted that identity was at issue in the trial and evidence remained in a chain of custody sufficient to establish it had not been altered in any material aspect. Defendant requested testing of the following 25 pieces of evidence in sealed envelopes, bags, or cans: Exhibit 1: a cigarette butt (if not previously tested); Exhibits 2, 3, and 4: three gel tabs; Exhibit 7: a white sock; Exhibit 8: a rain coat; Exhibit 9: a white spatula; Exhibit 11: a lid for a VHS tape; Exhibit 12: a knife blade; Exhibit 14: a broken VHS tape; Exhibit 16: a telephone; Exhibit 17: a piece of plastic; Exhibit 20: a partial print and fiber from the wall; Exhibit

21: a tissue with suspected blood; Exhibit 22: a Band-Aid with suspected blood; Exhibits 23 and 24: two swabs from bathroom sinks; Exhibit 25: toilet tissue with suspected blood; Exhibit 26: a hand towel with suspected blood; Exhibit 27: a tan king sport shirt with suspected blood; Exhibit 28: evidence bag from victim's right foot; Exhibit 29: evidence bag that secured victim's left foot; Exhibit 30: evidence bag that secured victim's right hand; Exhibit 31: evidence bag that secured victim's left hand; and Exhibit 40: contents of a pipe trap. Defendant alleged that the evidence had "the scientific potential to produce new, noncumulative evidence that is materially relevant to defendant's assertion of actual innocence." The petition alleged that the evidence was materially relevant "as it would corroborate petitioner's claim that another person was responsible for the death of the victim." He further noted the jury's question about DNA testing at trial and further alleged this was a "closely balanced case in which the State's evidence was not overwhelming."

¶ 89     On January 4, 2023, the trial court issued an order noting this was not the first evidentiary request by defendant. The order relied heavily on the finding by the appellate court in the decisions issued in *Horton IV* and *Horton V*. As to *Horton IV*, the trial court noted the appellate court found " 'overwhelming evidence establishing defendant's guilt,' " including the fact that the victim's blood was found on defendant's " 'boots, left sock and coat,' " the tread pattern from defendant's boot " 'was consistent with a pattern abrasion on [the victim's] skull,' and [defendant] attempted to 'rid himself of these clothes after leaving [the victim's] apartment.' " *Horton IV*, 2020 IL App (4th) 170643-U, ¶¶ 65-66. It further noted that while the court found that while DNA analysis may be critical in many cases, this was "not one of them." *Id.* ¶ 73. The trial court found the language in *Horton V* equally compelling, in which the court stated, "Because we have already considered and rejected defendant's contention regarding the materiality of the DNA evidence at issue, we find the trial court did not abuse its discretion in denying defendant's motion for a DNA database

44

search." *Horton V*, 2022 IL App (4th) 210672-U, ¶ 28. Thereafter, the trial court found defendant's "current request, like his past ones, is without arguable merit. Therefore, the motion is denied."

¶ 90   On January 30, 2023, defendant moved for reconsideration of the trial court's decision. On February 2, 2023, the trial court denied the reconsideration. Defendant timely appealed.

¶ 91                                    II. ANALYSIS

¶ 92   On appeal, defendant argues that the trial court's denial of his motion for forensic testing was in error. In support, defendant argues that he made a *prima facie* case as to the numerous items for which he requested forensic review by meeting the required elements under section 116-3, and therefore, the only issue is whether the evidence is materially relevant. He contends the testing of the 25 items was materially relevant because the evidence was close, noting the jury's message sent during deliberations regarding DNA evidence. Defendant also argues that this a close case "especially in light of the postconviction evidence revealing the DNA of another man under the victim's fingernails," a witness testifying that she believed someone named Mike committed the crime, and that witness's inability to identify defendant in a lineup. He further contends that he was not at the crime scene when the incident occurred based on the witness testimony placing the offense between 4 a.m. and 4:30 a.m. He argues that the State's evidence was not overwhelming and if the testing came back to someone other than defendant, it would bolster his claim that he did not commit the crime. He argues that there was substantial exculpatory evidence presented at trial and even more came to light since the conviction. Therefore, the requested DNA testing should have been ordered.

¶ 93   The State disagrees. The State first argues, citing *People v. Savory*, 197 Ill. 2d 203, 214 (2001), that defendant forfeited his argument that the trial court erred in denying his motion because he provided no analysis regarding the evidence at trial and the evidence to be tested. More

specifically, defendant never argued how any specific piece of evidence would advance his claim and merely provided a conclusory statement regarding the evidence as a whole. The State further contends, in the alternative, that the items requested for testing are not materially relevant and do not advance defendant's claim of actual innocence, noting two prior appellate court decisions that found the evidence was not closely balanced and overwhelmingly proved defendant's guilt. Thereafter, the State addresses the evidence supporting defendant's guilt and the evidence defendant wants tested, including where the evidence was found and its connection to the case. It concludes that no testing is necessary because it does not advance defendant's claim of innocence.

¶ 94    Defendant's reply to the State's brief disputes that he forfeited the claim for DNA testing by failing to provide any analysis of the evidence at trial and the evidence he seeks to test. He argues that his claim is based on a belief that the victim struggled with someone, but his body showed no evidence of a struggle and any blood shed by another man would reveal the real killer. He argues that he is only required to show that the evidence will potentially show his innocence, not that it shows actual innocence. He contends that his motion met this low bar, and the motion should have been granted because each of the items he seeks to test bears some relation to the violent struggle in the victim's apartment and could conceivably bear the blood or other DNA sources of the killer.

¶ 95    We review a ruling on a motion for postconviction testing under section 116-3 *de novo*. *People v. Stoecker*, 2014 IL 115756, ¶ 21; *People v. O'Connell*, 227 Ill. 2d 31, 35 (2007). The statute provides "an avenue for convicted defendants who maintained their innocence to test available genetic material capable of providing new and dramatic evidence materially relevant to the question of the defendant's actual innocence." *People v. Henderson*, 343 Ill. App. 3d 1108, 1114 (2003). In construing the statute, courts give the statutory language its plain and ordinary

46

meaning. *People v. Morrow*, 2022 IL App (1st) 200388, ¶ 50. Typically, to obtain the forensic testing, a defendant must make a *prima facie* showing that (1) identity was at issue at his trial and (2) "the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not be substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 5/116-3(b) (West 2022). Additional statutory requirements include that the evidence that defendant seeks to have tested either "(1) was not subjected to the testing that is now requested at the time of trial; or (2) although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results." *People v. Rozo*, 2012 IL App (2d) 100308, ¶ 6 (citing 725 ILCS 5/116-3(a)(1), (2) (West 2008)).

¶ 96    Even if the defendant meets these statutory requirements, to allow the testing, the trial court must determine that

> "(1) the result of the testing has the scientific potential to produce new, noncumulative evidence [ ] materially relevant to the defendant's assertion of actual innocence when the defendant's conviction was the result of a trial, even though the results may not completely exonerate the defendant, *** and

> (2) the testing requested employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116-3(c)(1), (2) (West 2022).

Interpretation of this language was provided by our supreme court in *Savory*, 197 Ill. 2d at 214. Therein, the court stated, while the evidence need not result in an absolute acquittal, the court must determine "whether the evidence at issue in this case is 'materially relevant to the defendant's assertion of actual innocence,' as section 116-3 requires." *Id*. This phrase has been interpreted as

being "evidence which tends to significantly advance" a claim of actual innocence. *Id.* at 213. This determination "requires a consideration of the evidence introduced at trial, as well as an assessment of the evidence defendant is seeking to test." *Id.*

¶ 97    While defendant's motion lists the evidence he requests for testing, and briefly addresses the evidence at trial, the State correctly notes that no specific argument was provided for any of the 25 pieces of evidence requested for testing. Instead, defendant relies on the jurors' questions during their deliberations. Those two questions were: (1) "How long has the defense team been in place (Nolan and Rosenbaum)?" and (2) "Could they have asked for certain items to be tested for DNA? (The defense team)" The questions came 34 minutes into deliberations, and they were sent a response indicating that they had all the evidence. At no time does defendant argue why testing any specific piece of evidence would significantly advance his claim of actual innocence. Instead, he generally argued that this evidence might reveal the identity of the real killer.

¶ 98    As to the actual pieces of evidence defendant requests for testing, seven pieces were not even found at the victim's apartment. Notably, the following evidence was found at Pearlie Mae's house: Exhibit 21: a tissue with suspected blood; Exhibit 22: a Band-Aid with suspected blood; Exhibits 23 and 24: two swabs from Pearlie Mae's bathroom sink; Exhibit 25: toilet tissue with suspected blood; Exhibit 26: a white hand towel with suspected blood; and Exhibit 27: a tan shirt with suspected blood. Nothing in defendant's motion explains why any of the evidence obtained from Pearlie Mae's house would contain blood from anyone other than defendant or another who was also at Amy's house that night. There was no evidence or testimony presented that anyone other than defendant appeared at Pearlie Mae's house following Amy's murder. Accordingly, we cannot find that testing of this evidence would materially advance defendant's claim of innocence.

48

¶ 99    The State argues that the cigarette butt (Exhibit 1) and the white sock (Exhibit 3) were previously tested. No argument to the contrary was made by defendant. As this evidence fails to meet the statutory requirement of not being tested, and no argument was presented that the different testing was required, we affirm the trial court's findings related to these pieces of evidence.

¶ 100    As to the remaining 16 pieces of evidence, Exhibits 2, 3, and 4 are gel footprint impressions made by the police of footprints found in the victim's blood. Ultimately, it was determined that the tread pattern was consistent with the boots worn by defendant on the night of the murder. Those boots were found in a garbage bag in a dumpster near Pearlie Mae's house and were covered in the victim's blood, and expert testimony established that the blood could not have landed on the top of defendant's boot by shaking his hands after touching the victim as defendant testified. No argument as to why the gel impressions, made from footprint impressions found in the victim's blood, would advance defendant's claim of innocence was made.

¶ 101    The remaining evidence was found in the victim's apartment. As noted in defendant's reply brief, his argument that the evidence is materially relevant is based on his claim that there was a struggle between the victim and the killer and the evidence may contain DNA from the killer's blood, which would advance defendant's claim of innocence. However, defendant's argument is precluded by the doctrine of *res judicata*. "The doctrine of *res judicata* provides that when a court of competent jurisdiction renders a final judgment on the merits of a claim, the court's judgment is conclusive of the rights of the parties and operates as a bar to future litigation of the same claim." *People v. Croft*, 2018 IL App (1st) 150043, ¶ 16 (citing *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 389 (2001)). While an exception exists if the law has changed (*id.* ¶¶ 17-21), the law has not evolved since the two most recent decisions were issued in this case.

¶ 102 As noted above, in *Horton IV*, the appellate court held that the record failed to support defendant's contention that the victim clawed, scraped, or scratched her killer. *Horton IV*, 2020 IL App (4th) 170643-U, ¶ 57. The court specifically addressed Dr. Mitchell's testimony regarding the victim's defensive injuries, stating they "were indicative of her attempt to shield her body from the objects used in her murder." *Id.* Thereafter, twice more, the appellate court stated there was no evidence the victim may "have clawed or scratched her offender as defendant asserts." *Id.* As the court previously determined that there was no evidence the killer was injured in a manner that would have left DNA at the scene, testing of the evidence requested by defendant cannot materially advance his claim of innocence.

¶ 103 Defendant's claim that the State's evidence was not overwhelming and substantial exculpatory evidence was presented at trial is equally barred by *res judicata*. In *Horton I*, 371 Ill. App. 3d 1224 (2007) (unpublished order under Supreme Court Rule 23), the appellate court found during its plain error review that the evidence was not closely balanced. More specifically, the court stated,

> "The evidence is not closely balanced. Defendant's clothes and boots were stained with Smith's blood, and defendant testified that he was inside Smith's apartment on January 29, 2004, at approximately 4:45 a.m. Expert witness Carter opined that the one-millimeter blood stains on defendant's boots represented medium to high velocity impact. Between Ruch's two telephone calls to Smith's apartment at 5:00 a.m. and 5:01 a.m., the loud noises from Smith's apartment stopped and Miller saw defendant yelling and gesturing toward the house as he walked away." *Horton I*, slip order at 13-14.

In *Horton IV*, the appellate court classified the evidence establishing defendant's guilt as "overwhelming." *Horton IV*, 2020 IL App (4th) 170643-U, ¶ 66. Further, in *Horton V*, the appellate court again "concluded the evidence establishing defendant's guilt was overwhelming." *Horton V*, 2022 IL App (4th) 210672, ¶ 28.

¶ 104 However, even if we were not bound by the doctrine of *res judicata*, we would reach no different conclusion. The evidence against defendant is overwhelming, it is not evenly balanced, and there is no evidence that the victim did anything other than try to protect herself during the brutal attack.

¶ 105 Further, while defendant contends Danielle's testimony was unconvincing because she provided a different name for the killer and was unable to pick him out of a lineup, defendant's argument has little merit in light of defendant's admission that he was at the victim's apartment on the night of the murder. Whatever merit might have been left in the argument following that admission is lost when the record reveals that the witness defendant claims is unreliable identified defendant as leaving the victim's apartment around the same time that defendant admitted leaving the victim's apartment on the night of the murder.

¶ 106 Considering the overwhelming evidence of defendant's guilt at trial, the previous postconviction forensic testing, the previously issued appellate court decisions, and defendant's current petition for forensic testing, we cannot find that any DNA testing, even if favorable to the defendant, would materially advance his claim of actual innocence as there is no evidence that Amy did anything other than try to protect herself from the brutal assault during the attack. We cannot find that new DNA evidence would exclude the strongest evidence of defendant's guilt, namely his hidden boots and clothing covered in Amy's blood, his lies to the police investigators, his ultimate admission that he was at Amy's apartment within the period of time she was murdered,

51

and the witness's positive identification as defendant being the person who left Amy's apartment shortly after the strange noises came to an end. Accordingly, we affirm the trial court's dismissal of defendant's postconviction petition for forensic testing.

¶ 107                                III. CONCLUSION

¶ 108 For the foregoing reasons, we affirm the trial court's dismissal of defendant's postconviction petition for forensic testing.


¶ 109 Affirmed.